# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-869 (RMC) |
| DAVID E. WHITTEMORE, WHITTEMORE MANAGEMENT, INC., and PETER S. CAHILL, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

As a result of a civil judgment based on securities fraud pursuant to a "pump and dump" scheme, the Securities and Exchange Commission moves for disgorgement and penalties against Defendants Peter S. Cahill, David E. Whittemore, and Whittemore Management, Inc. ("WMI").[1] Defendants each filed a Consent to the entry of judgment restraining and enjoining them from violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* Cahill's Consent [Dkt. # 72] ¶ 3; Whittemore Defs.' Consent [Dkt. # 74] ¶ 3. The SEC now moves for disgorgement, interest, and civil penalties. *See* SEC's Mot. for Disgorgement & Civil Penalties [Dkt. # 75] ("SEC's Mot."). As explained below, the Court will grant in part and deny in part the SEC's motion.

## I.  FACTS

Judgment has been entered against the Defendants permanently restraining and

---

[1] Mr. Whittemore and WMI are collectively referred to as the "Whittemore Defendants."

enjoining them violating the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See* J. Against Cahill [Dkt. # 73]; J. Against Whittemore Defs. [Dkt. # 89].[2] By signing the Consents to entry of judgment, the Defendants agreed that they are precluded from arguing that they did not violate federal securities laws and that the Court would order, and they would pay, disgorgement of ill-gotten gains, prejudgment interest, and a civil penalty.  *See* Cahill's Consent ¶ 3; Whittemore Defs.' Consent ¶ 3; J. Against Cahill; J. Against Whittemore Defs.  The parties dispute the dollar amounts of such disgorgement and penalties.

While the Defendants specifically did not admit or deny the allegations of the Complaint, they agreed that for the purposes of the SEC's motion for disgorgement the allegations of the Complaint shall deemed to be true.   The Consents provided:

> [Defendants] agree that the Court shall order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 231(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  [Defendants] further agree that the amounts of the disgorgement and civil penalty shall be determined by the Court upon the motion of the [SEC] and that prejudgment interest shall be calculated from the date of the violation, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income taxes as set forth in 26 U.S.C. § 6621(a)(2).  [Defendants] request that the Court hold a hearing on any motion made by the Commission.[3]  [Defendants] further agree that in connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (1) [Defendants] will be precluded from arguing that they did not violate the federal securities

---

[2] "Clearlake Venture Group," an entity allegedly controlled by Mr. Cahill, was also a named defendant. Compl. ¶ 1.  Mr. Cahill asserts that Clearlake Venture Group is non-existent and thus it filed no Consent in this matter.  Inasmuch as the SEC does not contest Mr. Cahill's representation, the Court deems it conceded that Clearlake is non-existent.  Accordingly, the Court will not enter an order requiring Clearlake to disgorge any monies or pay any penalties, and Clearlake will be dismissed from this suit.

[3] The Court held a hearing on this matter on December 23, 2009.

laws as alleged in the Complaint; (b) [Defendants] may not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the [C]ourt; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn depositions, or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

Cahill's Consent ¶ 3, Whittemore Defs.' Consent ¶ 3.

Consequently, the Court deems the facts set forth in the Complaint to be true.  The Complaint alleges a scheme, commonly referred to as a "pump and dump," to defraud the public through the nationwide broadcasting of fraudulent voicemail messages touting the stocks of small, thinly-traded companies.  Compl. ¶ 1.  Such messages are intended to deceive recipients by making them believe that the caller had dialed their number by mistake and that they were the unintended recipient of a hot stock tip meant for a friend of the caller; the calls are intended to "pump" or inflate the trading volume and share prices of the touted company.  *Id*.  The parties engaging in the fraud and their associates can then "dump" the stock, *i.e.* sell it, at the inflated price and thereby profit from the scheme.

In July 2004, Mr. Cahill hired WMI and its sole employee, Mr. Whittemore, to place hundreds of thousands of calls nationwide in order to leave prerecorded messages.  *Id*. ¶ 11.  The Whittemore Defendants are in the business of using auto-dialing computers to broadcast prerecorded messages via telephone.  *Id*. ¶ 6.  Mr. Cahill hired the Whittemore Defendants to broadcast voicemail messages promoting the stock of Triton American Energy Corporation ("TRAE"), an oil and natural gas exploration and production company.  *Id*. ¶¶ 9 & 11.  TRAE's common stock is quoted in the

Pink Sheets, a price quotation system primarily used for trading the securities of small corporations that do not meet the minimum listing requirements of a national securities exchange. *Id.*

Mr. Cahill engaged the Whittemore Defendants after TRAE's president, Louis Guidry, hired Mr. Cahill to raise capital for TRAE. *See* SEC Supp. Mem. [Dkt. # 82], Ex. A ("Guidry Tr.") at 23-24.[4]  Mr. Cahill received 1.2 million shares of TRAE stock as his fee. Guidry Tr. at 22. Mr. Cahill, in turn, paid the Whittemore Defendants 594,000 shares of TRAE stock for their auto-dialing services. The Whittemore Defendants later returned the TRAE shares to Mr. Cahill, and Mr. Cahill paid them $142,000 in lieu of the stock. Compl. ¶ 11.

On or about August 17, 18, 19, 31 and September 14, 2004, and other dates unknown, WMI broadcast a series of false and misleading messages touting TRAE, each of which was substantially similar:

> Hey David, it's Kathy. Listen, honey, Jim wanted me to give you a call. I just put him on a plane and he didn't have time to call you himself, uh, but he wanted you to know . . . remember those guys that do those stock promos? They're getting ready to start another one this week. Uhm, they just did, uh, shoot. Hang on there a minute, let me look here and see. Okay, the first one was CNDD, the other one was PWRM, and he said that the next one you can get in on was TRAE. Let me look here, uhm, yeah, TRAE. It's an oil company. And, anyway, he said he thought that it's gonna be their best stock promotion this year. It's at 75 right now and I think it's going to go up to like five or six bucks, or something like that. He said you needed to get in in the morning before the price starts going up 'cause you definitely want in on this one. Give him a call later tonight, sweetheart, and, um, I think that's it. I'll talk to you soon. Bye.

*Id.* ¶ 12.

---

[4] Pursuant to the terms of the Consents, the Court may consider sworn investigative testimony, such as this transcript of Mr. Guidry's testimony before the Texas State Securities Board. *See* Cahill's Consent ¶ 3 ("the court may determine the issues . . . on the basis of . . . excerpts of sworn depositions or investigative testimony"); Whittemore Defs.' Consent ¶ 3 (same).

As the Complaint says bluntly, "The messages had their intended effect, increasing the trading volume and share price of TRAE stock." *Id.* ¶ 13. The share price of the TRAE stock increased from $.32 per share on August 6, 2004 to a high of $.97 per share on August 19, 2004.[5] *Id.* The trading volume during this period increased from 10,000 shares to 756,000 shares, an increase in market capitalization of around $12 million. *Id.*

Defendants profited from the TRAE pump and dump scheme. Between August 18 and September 28, 2004, Mr. Cahill sold 1,060,200 TRAE shares, generating proceeds in the amount of $738,473. *See* SEC's Mot., Ex. B ("Lowry Decl.") ¶ 13.[6] Mr. Cahill then wired $549,300 of the $738,473 amount to an Interest Only Lawyers Trust Account ("IOLTA account") in the name of WMI at Godwin Gruber LLP.[7] The deposit into the WMI IOLTA account was made on the authority of Phillip W. Offill, a partner in the Godwin Gruber firm and counsel to the Whittemore Defendants.[8] *Id.* ¶¶ 14 & 16.

Further, the SEC alleges that in September and October of 2004, Defendants profited when an entity called BBX Support, Inc. ("BBX") also made deposits into the WMI IOLTA account

---

[5] Because the Consents require the Court to treat the allegations set forth in the Complaint as true, Mr. Cahill's effort to demonstrate that the rising price of TRAE stock had more to do with exaggerated press announcements from TRAE's president than these phone calls is unavailing.

[6] Per the Consents, the Court may consider the Declaration of Robert Lowry, an expert and consultant hired by the SEC. *See* Cahill's Consent ¶ 3 ("the court may determine the issues . . . on the basis of . . . affidavits [and] declarations"); Whittemore Defs.' Consent ¶ 3 (same).

[7] Godwin Gruber LLP later became known as Godwin Pappas Langley Ronquillo LLP and then Godwin Ronquillo PC. The law firm is not implicated in any of the securities violations at issue.

[8] Mr. Cahill had recommended Mr. Offill, a former SEC lawyer, to Mr. Whittemore, who retained Mr. Offill. Mr. Offill was not charged in this case but has been convicted recently of a similar scheme of securities fraud and he is incarcerated awaiting sentencing.

— deposits totaling $147,500. *Id.* ¶ 17. The SEC alleges further that Richard Markle, Mr. Cahill's attorney, wired $78,500 into a NAFCO account maintained by Mr. Whittemore's wife, Tracy Whittemore, and her company TDW Management, Inc. ("TDW"). *Id.* ¶ 18.

The Whittemore Defendants broadcast a similar series of fraudulent messages intended to deceive recipients by making them believe they had received a hot stock tip about Yap International, Inc. ("YPIL"), an Internet communications company. *Id.* ¶¶ 10 & 15. Like the TRAE stock, YPIL's common stock is quoted in the Pink Sheets. On August 13, 2004, an unknown person or entity paid WMI 210,000 shares of YPIL to broadcast these messages. *Id.* ¶ 15.

The Whittemore Defendants broadcast messages regarding YPIL stock similar to those concerning the TRAE stock on August 30 and 31 and September 9, 2004, and other dates unknown. *Id.* ¶ 16. The following voicemail message, or a substantially similar message, was left on answering machines nationwide:

> Hey Mark, it's Jill. Listen, honey, Gary wanted me to give you a call. Um, I just put him on a plane and he didn't have time, but he wanted you to know . . . remember those guys that do those stock promotions? They're getting ready to start another one this week. And, they just did, let me look here, AUML and the other one was CNDD. Uh, he said that the next one you can get in on was Y-P as in Paul-I-L, I think. Yeah, YPIL. It's a communications company that's doing some sort of free long distance service called the Yapper. Anyway, he said he thought that it's gonna be the best one, uh the best stock promo this year. It's at 68 cents right now and they think it's going to go up to like six or seven dollars, or something outrageous. But anyway, he said you needed to get in on it in the morning before the price starts going up 'cause you definitely want to get in on this one. So, um, give him a call later tonight, and, um, I'll be talking to you soon. Bye sweetie.

*Id.*

Like the TRAE messages, the YPIL messages were effective. The YPIL share price

rose from $.68 per share on August 27, 2004 to $1.00 per share on September 1, 2004. *Id.* ¶ 17.  The trading volume during this period rose from 7,380 to 302,814, an increase in market capitalization of approximately $10 million.  *Id.*

The Whittemore Defendants profited from the YPIL stock scheme.  Between August 16 and 31, 2004, Mr Whittemore sold 45,014 shares of YPIL generating proceeds totaling $35,902. Lowry Decl. ¶ 12.  Further, Turbo Consulting Services, Inc., sold in excess of 100,000 YPIL shares between August and October 2004, generating proceeds of around $97,284.  *See id.* ¶ 15.  During September 2004, Turbo wired funds totaling $64,900 into the WMI IOLTA account.  *Id.* ¶ 16.  In addition, Turbo sent one wire in the amount of $8,130 directly to Mr. Whittemore's NAFCO Federal Credit Union account on August 18, 2004.  *Id.*  The wires from Turbo to the Whittemore Defendants totaled $73,030.  *Id.*

The SEC seeks disgorgement of $1,494,751, the ill-gotten gain from the TRAE securities fraud, jointly and severally from Mr. Cahill and the Whittemore Defendants.  This amount consists of the following:

$738,473 – proceeds of TRAE transactions made by Mr. Cahill

$142,000 – amount Mr. Cahill paid to the Whittemore Defendants in lieu of stock

$147,500 – amount BBX wired to the IOLTA account in the name of WMI

$78,500 – amount Mr. Markle deposited into the TDW's NAFCO account

+      $388,278 – prejudgment interest

**Total**   $1,494,751.

The SEC conceded at the hearing on this matter that it has no evidence that Mr. Cahill had a part in the YPIL fraud.  *See* Minute Order posted Jan. 12, 2010.  Thus, with regard to the YPIL

fraud, the SEC seeks disgorgement and prejudgment interest from the Whittemore Defendants only

(and not from Mr. Cahill) in the additional amount of $108,932, which includes:

$35,902 – proceeds of YPIL transactions made by the Whittemore Defendants

+      $73,030 – proceeds of Turbo's YPIL transactions wired to the IOLTA account

**Total**   $108,932.

The SEC also seeks prejudgment interest on the $108,932 total amount.  In addition to disgorgement

and prejudgment interest as specified above, the SEC seeks civil penalties against the Defendants.

## II.  LEGAL STANDARD

Disgorgement of a defendant's ill-gotten gains from a securities fraud is an equitable

remedy.  *See SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997).  "The paramount purpose

of . . . ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing."

*SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987).  While the proper measure of disgorgement is the

value by which a stock increased during the fraudulent activity,[9] *see SEC v. Bilzerian*, 814 F. Supp.

116, 121 (D.D.C. 1993), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994), the disgorgement amount only needs

to be a "reasonable approximation of profits causally connected to the violation."  *SEC v. First City*

*Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).  Further, "any risk of uncertainty should fall

on the wrongdoer whose illegal conduct created that uncertainty."  *Id*. at 1232.  In other words, the

SEC only needs to offer a *prima facie* reasonable approximation of profits connected to the securities

---

[9] Defendants insist the correct term is "alleged fraudulent activity" because they explicitly did not admit or deny their participation in any fraud.  *See* Cahill's Consent ¶ 2; Whittemore Defs.' Consent ¶ 2.  For purposes of the disgorgement motion, however, the Court is required to accept the Complaint allegations as true, and the Complaint clearly charges each Defendant with securities fraud.  Further, pursuant to their Consents, Defendants are precluded from arguing that they did not violate federal securities laws.  *See* Cahill's Consent ¶ 3; Whittemore Defs.' Consent ¶ 3.

violation, and then the burden of proof shifts to the defendants to rebut the presumption that all profits gained while the defendants were in violation of the law constituted ill-gotten gains. *Bilzerian*, 814 F. Supp. 2d at 121.

## III. ANALYSIS

### A. Disgorgement

Defendants repeatedly assert that they relied on the advice of their attorney, Mr. Offill, and that Mr. Offill, who is not before the Court, is the guilty culprit here.  But this claim fails in the face of the Consents to judgment, which provide that Defendants are precluded from arguing that they did not violate securities laws, that they may not challenge the validity of the Consent or the Judgment, and that the allegations of the Complaint are deemed to be true.  *See* Cahill's Consent ¶ 3; Whittemore Defs.' Consent ¶ 3.  The Complaint allegations and the full record before the Court demonstrate that none of the three Defendants is innocent of the charges, despite their valiant efforts to put all the blame on Mr. Offill.

The Defendants also argue that the SEC's disgorgement remedy should be limited to the monetary values alleged in the Complaint.  But the Consents anticipated further litigation, including discovery, prior to the Court's determination of the appropriate disgorgement amounts.  *See* Cahill's Consent ¶ 3 ("In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties"); Whittemore Defs.' Consent ¶ 3 (same).  Further, the Consents provided that the Court may determine the issues not only based on the allegations of the Complaint, but also based on declarations, sworn depositions, investigative testimony, and documentary evidence.  *See* Cahill's Consent ¶ 3; Whittemore Defs.' Consent ¶ 3.  Thus, disgorgement is not limited by the dollar amounts set forth

in the Complaint.

The parties dispute the amounts of disgorgement based on whether Defendants are entitled to an offset in the amount of the value of the stock they held just before the "pump and dump" schemes began. Defendants argue strenuously that the proper amount of disgorgement is the *increase* in the shares' value as a result of the fraud. That is, Defendants argue that they are entitled to an offset in the amount of the stock share's pre-fraud sales price, $.32 per share for the TRAE stock and $.68 per share for the YPIL stock.[10]

The SEC argues that Defendants are not entitled to an offset because the record does not reveal that they paid for those stocks. Since information regarding whether and how much they paid for the stock is peculiarly in control of the Defendants and since they have asserted their Fifth Amendment right not to reveal such information, the SEC urges the Court to draw an adverse inference against Defendants. The SEC asserts that the basis by which Defendants held TRAE and YPIL stocks was $.00, and thus that *all* value must be disgorged.

The Court is persuaded that the SEC is correct. Mr. Cahill obtained 1.2 million shares of TRAE stock from Mr. Guidry. Mr. Cahill first paid the Whittemore Defendants in TRAE shares but then paid $142,000 in cash to the Whittemore Defendants and the shares were returned to Mr. Cahill. The use of TRAE shares to compensate Mr. Whittemore illuminates the reasons that Mr. Cahill obtained the shares from Mr. Guidry: to compensate others in the scheme and, presumably, himself. Inasmuch as Mr. Cahill attempted to compensate the Whittemore Defendants

---

[10] As described above, the Complaint alleges that the share price of the TRAE stock increased from $.32 per share on August 6, 2004 to a high of $.97 per share on August 19, 2004. Compl. ¶ 13. The YPIL share price rose from $.68 per share on August 27, 2004 to $1.00 per share on September 1, 2004. *Id.* ¶ 17.

for broadcast voicemail service with TRAE shares, it is not difficult to deduce that the TRAE shares were provided to Mr. Cahill for the same purpose. Mr. Cahill obtained those shares as payment for his role in the fraud. The fact that the shares had an initial value of $.32/share is not material. As to Mr. Cahill, his investment was nil. Inasmuch as the TRAE shares represented payment to Mr. Cahill for the purpose of engaging in fraud, it would be inequitable to allow him to retain any part of their value.

The very same analysis obtains for the YPIL shares. The YPIL shares were paid to the Whittemore Defendants as compensation for the broadcast campaign touting YPIL share value. It would inequitable to allow the Whittemore Defendants to retain $.68/share for the YPIL shares because that money represents payment for unlawful fraudulent activity.

The Defendants resist this conclusion, arguing that the SEC bears the burden of proof and that the SEC has not proven that these Defendants did *not* pay for the TRAE and YPIL shares. They contend that the SEC's approach — whereby the agency puts the burden on the Defendants to prove that they paid value for the shares and assails their reliance on their Fifth Amendment rights — completely up-ends the American judicial system, where plaintiffs bear the burden of proving their cases and defendants do not have to prove anything.

Defendants' argument lacks merit, as a court may draw an adverse inference against a civil litigant who invokes his Fifth Amendment privilege. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). "Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof." *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998); *see also In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 58, 68 (D.D.C. 2000). The Court may make an adverse inference because this is a civil case and these Defendants control the

evidence.  By invoking their Fifth Amendment privilege, they have failed to present evidence that might refute the SEC's allegation that they paid nothing for their stock.

Even without the adverse inference, the record demonstrates that the TRAE shares were intended to be compensation for the fraudulent activities, as Mr. Cahill's own effort to pay WMI solely in TRAE shares demonstrates.  Moreover, any uncertainty in calculating disgorgement falls on the Defendants here, as they are the wrongdoers whose illegal conduct created the uncertainty.  *See First City Fin. Corp., Ltd.*, 890 F.2d at 1132.  The SEC has presented a *prima facie* reasonable approximation of profits connected to the securities violations at issue here, and Defendants have failed to rebut the SEC's allegations regarding the amounts that should be disgorged.  They have not presented evidence that any portion of their profit was due to legal, and not illegal, activity.  *See Bilzerian*, 814 F. Supp. 2d at 121.

For these reasons, the Court concludes that Defendants paid nothing for their TRAE and YPIL shares.  To allow Defendants to retain the initial trading value of the TRAE and YPIL shares ($.32 and $.68, respectively) would allow them to profit from fraud.  Such a result is offensive to equity.  Defendants must disgorge the full amount of their ill-gotten gain, without offset.

Mr. Cahill also argues that he retained none of the proceeds from the sale of TRAE shares and that the SEC should not be allowed to require him to disgorge monies he does not have in his possession.  While this argument has facial appeal, the Court finds that it is not germane.  The "manner in which [defendants] chose to spend [their] misappropriations is irrelevant as to [their] obligation to disgorge."  *SEC v. Levine*, 517 F. Supp. 2d 121, 139 (D.D.C. 2007).  "[W]hether they chose to use this money to enhance [their] social standing through charitable contributions, to travel around the world, or to keep [their] coconspirators happy is their own business."  *Id*.  Whether Mr.

Cahill used the proceeds to pay Mr. Whittemore, Mr. Offill, or the grocer is irrelevant.  He was a central part of a fraud that falsely and temporarily increased the stock value of TRAE and he sold hundreds of thousands of TRAE shares at inflated prices.[11]  He cannot now evade the consequences of these conceded actions.

Defendants also argue that disgorgement should not be joint and several, but that each should be separately responsible for ill-gotten gain traced to them.  Joint and several liability for disgorgement of ill-gotten gains is appropriate when two or more individuals collaborate or have a close relationship in engaging in the violations of securities law.  *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1117 (9th Cir. 2006).  In this case, it is clear that Defendants collaborated in the "pump and dump" scheme with regard to the TRAE stock.  Mr. Cahill hired the Whittemore Defendants to broadcast fraudulent voicemail messages promoting the TRAE stock.  Mr. Guidry paid Mr. Cahill 1.2 million shares of TRAE to raise capital for the company, and Mr. Cahill, in turn, paid the Whittemore Defendants 594,000 shares of TRAE for such auto-dialing services.  The Whittemore Defendants later returned the stock to Mr. Cahill, and Mr. Cahill paid them $142,000.  Because the Defendants collaborated, they should be jointly and severally liable for disgorgement related to the TRAE stock scheme.

Defendants further contend that the SEC has not demonstrated that the BBX deposits into the WMI IOLTA account were related to the TRAE or the YPIL fraud.  BBX deposited a total of $147,500 into the IOLTA account.  *See* Lowry Decl. ¶ 17.  The SEC alleges that BBX was

---

[11] The Court is dealing with an incomplete record because the Defendants asserted their Fifth Amendment rights, as is perfectly acceptable.  However, it strains credulity to believe that Mr. Cahill accepted 1.2 million shares of TRAE stock as advance payment for helping Mr. Guidry, hired WMI and Mr. Whittemore to help inflate the value of the stock, and sold hundreds of thousands of TRAE shares at fraudulently-inflated prices without some profit to himself.

an entity associated with the fraud as follows:  BBX was a client of Mr. Offill, doing business as

Illyad Consulting NA.; BBX received a bill dated August 27, 2004, from an entity called JJJ

Marketing for fees in the amount of $37,500 associated with 3 million phone calls between August

27 and 29, 2004; the Whittemore Defendants paid the $37,500 bill via the WMI IOLTA account; in

September 2004, Mr. Whittemore paid JJJ Marketing $40,000 from the WMI IOLTA account; and

in September and October 2004, BBX paid $147,500 into the WMI IOLTA account.  *See* SEC's

Mot., Ex. A ("Bellaire Decl.") ¶¶ 25 & 26.  The SEC must offer a *prima facie* reasonable

approximation of profits causally connected to the securities violation.  *See First City Fin. Corp.*,

890 F.2d at 1231.  It has failed to do so with regard to the BBX deposit.  The SEC has not presented

evidence that the BBX monies paid to the Whittemore Defendants were *causally* related to the

TRAE or the YPIL stock schemes.  Further, the SEC has not connected the BBX deposit to Mr.

Cahill.  The Court will deny the SEC's request for disgorgement of this amount.

Defendants also argue that the SEC failed to show that Mr. Markle's deposit into the

TDW account was causally connected to the TRAE fraud.  Richard Markle, Mr. Cahill's attorney,

wired $78,500 into a NAFCO account on behalf of TDW in April 2005, not long after the TRAE

fraud scheme.  Lowry Decl. ¶ 18.  Mr. Whittemore's wife, Tracy, opened the account for TDW;

TDW is a company that she operated in late 2004 to early 2005.  *Id*.  Ms. Whittemore did not know

Mr. Markle or where the deposit came from, but her husband told her *in advance* to expect the

$78,500 deposit.  *Id*. ¶ 20 (citing Tracy Whittemore Dep. at 30 & 32-33).  This transaction reveals

the shuffling of money among associates and their family members that is typical of a stock fraud

scheme.  *See, e.g., Edward J. Mawod & Co. v. SEC*, 591 F.2d 588, 595 (10th Cir. 1979) (evidence

regarding stock sales proceeds that were "washed" through nominee accounts constituted proof of

a "pump and dump" scheme).  "Allowing [defendant's spouse] to now claim valid ownership of those proceeds would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives, without even their knowledge." *SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998).  The evidence is sufficient to show that Mr. Markle's deposit into the TDW account was causally connected to the TRAE fraud; Defendants shall be jointly and severally responsible for the disgorgement of this sum.

### B. Prejudgment Interest and Civil Penalties

To prevent a wrongdoer from benefitting from an interest-free loan on his ill-gotten gains, courts require the payment of prejudgment interest. *Levine*, 517 F. Supp. 2d at 141. While the Defendants attempt to avoid prejudgment interest and a civil penalty, their Consents provide expressly that "[Defendants] agree that the Court *shall order* disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 231(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]." *See* Cahill's Consent ¶ 3 (emphasis added); Whittemore Defs.' Consent ¶ 3 (same).  Courts have approved the use of the Internal Revenue Service underpayment rate as a proper rate for prejudgment interest in disgorgement cases. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).  "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *Id*. The SEC's request for prejudgment interest will be granted.

The SEC also seeks a "third tier" monetary civil penalty because the violation involved fraud and deceit and created a significant risk of substantial loss to other persons. *See* 5 U.S.C. § 78u(d)(3)(B) (a third tier penalty is authorized if "(aa) the violation . . . involved fraud, deceit, manipulations, or deliberated or reckless disregard of a regulatory requirement; and (bb) such

violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."). At the time of Defendants' fraudulent conduct, third tier penalties for each violation were not to exceed the greater of (I) $120,000 for a natural person or $600,000 for any other person . . . or (II) the gross amount of pecuniary gain to such defendants as a result of the violation. *Id*.[12] Courts have discretion to determine the amount of the penalty in light of the facts and the circumstances of the case at hand. *See SEC v. Lybrand*, 281 F. Supp. 2d 726, 729, (S.D.N.Y. 2003), *aff'd*, 425 F.3d 143 (2d Cir. 2007).

Given the large dollar amount of the disgorgement together with prejudgment interest and the paucity of proof of large losses to others, the Court concludes that a civil penalty of $25,000 per Defendant is ample for the purpose of deterrence. *See SEC v. Daly*, 572 F. Supp. 2d 129, 134 (D.D.C. 2008) (imposing third tier penalty for the purpose of deterring others).

## C. Time Deadline for Payment

The SEC asks that the Court require Defendants to pay the judgment within ten days and if they fail to pay timely, require that Defendants be subject to contempt proceedings. Imposition of a time deadline for payment of a judgment is rare. *See SEC v. House Asset Mgmt.*, No. 02-2147, 2004 WL 2126318, at *1 (C.D. Ill. Sept. 17, 2004). Generally, a court should not find someone in contempt if that person lacks the ability to comply with the order. *Id*. The Court will not impose a time deadline here, nor will the Court impose the threat of contempt proceedings at this juncture. The SEC may pursue the usual remedies available to obtain satisfaction of the judgment.

---

[12] The statutory rates of $100,000 and $500,000 are adjusted for inflation pursuant to 17 C.F.R. § 201.1001.

## IV.  CONCLUSION

For the foregoing reasons, Clearlake Venture Group, a nonexistent entity will be dismissed from this case.  Further, the SEC's motion for disgorgement and civil penalties [Dkt. # 75] will be granted in part and denied in part.  The Court will order disgorgement jointly and severally from Mr. Cahill and the Whittemore Defendants as follows:

> $738,473 – proceeds of TRAE transactions made by Mr. Cahill
>
> $142,000 – amount Mr. Cahill paid to the Whittemore Defendants in lieu of stock
>
> + $78,500 – amount Mr. Markle deposited into the TDW's NAFCO account
>
> **Total**  $958,973.

Defendants shall also be jointly and severally liable for prejudgment interest on this total amount of $958,973, calculated using the IRS underpayment rate.

The Whittemore Defendants only (and not Mr. Cahill) shall disgorge the additional amount of $108,932, which includes:

> $35,902 – proceeds of YPIL transactions made by the Whittemore Defendants
>
> + $73,030 – proceeds of Turbo's YPIL transactions wired to the IOLTA account
>
> **Total**  $108,932.

The Whittemore Defendants (and not Mr. Cahill) will be liable to pay prejudgment interest on this additional amount of $108,932, calculated using the IRS underpayment rate.  Each Defendant shall also be required to pay a $25,000 civil penalty.  A memorializing Order will be issued in the form attached to this Memorandum Opinion as Exhibit A, upon the SEC's filing of a notice indicating the proper prejudgment interest based on the adjusted sums set forth above.  The SEC shall file a notice of the prejudgment interest amounts no later than March 16, 2010.

Date: March 9, 2010
                                                 /s/
                                        ROSEMARY M. COLLYER
                                        United States District Judge