# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 05-869 (RMC) |
| DAVID E. WHITTEMORE, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION

On February 12, 2009, this Court entered Judgment against Defendant Peter S. Cahill, and on February 17, 2010, this Court entered a similar Judgment against Defendants David E. Whittemore and Whittemore Management, Inc. ("WMI"). *See* J. Against Cahill [Dkt. # 73]; J. Against Whittemore Defs. [Dkt. # 89]. In the underlying Consents of each Defendant, and without admitting or denying the allegations of the Complaint, the Defendants agreed to entry of the Judgments which restrain them from violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the relevant rule thereunder, and also agreed to a court order of "disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty . . . ." *See* Cahill's Consent [Dkt. # 72] ¶ 3; Whittemore Defs.' Consent [Dkt. # 74] ¶ 3. The parties have been arguing ever since about the values to apply to each of these remedies.

The Court previously granted the SEC's request for prejudgment interest against Defendants. *See* Mem. Op. [Dkt. # 90]; Am. Order [Dkt. # 93]. Defendants seek reconsideration

of the prejudgment interest calculation and the SEC opposes.[1] As explained below, the motions to reconsider will be denied, but the Amended Order [Dkt. # 93] granting judgment will be corrected to reflect the proper disgorgement amounts and the proper prejudgment interest calculation.

## I. FACTS

The Complaint alleges a scheme, commonly referred to as a "pump and dump," to defraud the public through the nationwide broadcasting of fraudulent voicemail messages touting the stocks of small, thinly-traded companies. Compl. ¶ 1. Such messages are intended to deceive recipients by making them believe that the caller had dialed their number by mistake and that they were the unintended recipient of a hot stock tip meant for a friend of the caller; the calls are intended to "pump" or inflate the trading volume and share prices of the touted company. *Id*. The parties engaging in the fraud and their associates can then "dump" the stock, *i.e.* sell it, at the inflated price and thereby profit from the scheme.

In July 2004, Mr. Cahill hired WMI and its sole employee, Mr. Whittemore, to place hundreds of thousands of calls nationwide in order to leave prerecorded messages. *Id*. ¶ 11. The Whittemore Defendants are in the business of using auto-dialing computers to broadcast prerecorded messages via telephone. *Id*. ¶ 6. Mr. Cahill hired the Whittemore Defendants to broadcast voicemail messages promoting the stock of Triton American Energy Corporation ("TRAE"), an oil and natural gas exploration and production company. *Id*. ¶¶ 9 & 11. TRAE's common stock is quoted in the Pink Sheets, a price quotation system primarily used for trading the securities of small corporations

---

[1] *See* Whittemore Defs.' Mot. for Recons. [Dkt. # 94]; Cahill's Mot. for Recons. [Dkt. # 95]; SEC's Opp'n [Dkt. # 96]; Cahill's Reply [Dkt. # 97]; Whittemore Defs.' Mot. for Joinder in Cahill's Mot. for Partial Recons. [Dkt. # 98]; Whittemore Defs.' Notice of Calculation of Prejudgment Interest [Dkt. # 99]; SEC's Opp'n to to Prejudgment Interest Calculations [Dkt. # 101]; Whittemore Defs.' Reply [Dkt. # 102].

that do not meet the minimum listing requirements of a national securities exchange. *Id*.

Mr. Cahill engaged the Whittemore Defendants after TRAE's president, Louis Guidry, hired Mr. Cahill to raise capital for TRAE. *See* SEC Supp. Mem. [Dkt. # 82], Ex. A ("Guidry Tr.") at 23-24.[2] Mr. Cahill received 1.2 million shares of TRAE stock as his fee. Guidry Tr. at 22. Mr. Cahill, in turn, paid the Whittemore Defendants 594,000 shares of TRAE stock for their auto-dialing services. The Whittemore Defendants later returned the TRAE shares to Mr. Cahill, and Mr. Cahill paid them $142,000 in lieu of the stock. Compl. ¶ 11.

On or about August 17, 18, 19, 31 and September 14, 2004, and other dates unknown, WMI broadcast a series of false and misleading messages touting TRAE, each of which was substantially similar:

> Hey David, it's Kathy. Listen, honey, Jim wanted me to give you a call. I just put him on a plane and he didn't have time to call you himself, uh, but he wanted you to know . . . remember those guys that do those stock promos? They're getting ready to start another one this week. Uhm, they just did, uh, shoot. Hang on there a minute, let me look here and see. Okay, the first one was CNDD, the other one was PWRM, and he said that the next one you can get in on was TRAE. Let me look here, uhm, yeah, TRAE. It's an oil company. And, anyway, he said he thought that it's gonna be their best stock promotion this year. It's at 75 right now and I think it's going to go up to like five or six bucks, or something like that. He said you needed to get in in the morning before the price starts going up 'cause you definitely want in on this one. Give him a call later tonight, sweetheart, and, um, I think that's it. I'll talk to you soon. Bye.

*Id*. ¶ 12.

As the Complaint says bluntly, "The messages had their intended effect, increasing

---

[2] Pursuant to the terms of the Consents, the Court may consider sworn investigative testimony, such as this transcript of Mr. Guidry's testimony before the Texas State Securities Board. *See* Cahill's Consent ¶ 3 ("the court may determine the issues . . . on the basis of . . . excerpts of sworn depositions or investigative testimony"); Whittemore Defs.' Consent ¶ 3 (same).

the trading volume and share price of TRAE stock." *Id.* ¶ 13. The share price of TRAE stock increased from $.32 per share on August 6, 2004 to a high of $.97 per share on August 19, 2004.[3] *Id.* The trading volume during this period increased from 10,000 shares to 756,000 shares, an increase in market capitalization of around $12 million. *Id.*

Defendants profited from the TRAE "pump and dump" scheme. Between August 18 and September 28, 2004, Mr. Cahill sold 1,060,200 TRAE shares, generating proceeds in the amount of $738,473. *See* SEC's Mot., Ex. B ("Lowry Decl.") ¶ 13.[4] Mr. Cahill then wired $549,300 of the $738,473 amount to an Interest Only Lawyers Trust Account ("IOLTA account") in the name of WMI at Godwin Gruber LLP.[5] The deposit into the WMI IOLTA account was made on the authority of Phillip W. Offill, a former partner in the Godwin Gruber firm and counsel to the Whittemore Defendants.[6] *Id.* ¶¶ 14 & 16.

In September and October of 2004, an entity called BBX Support, Inc. ("BBX") also made deposits into the WMI IOLTA account — deposits totaling $147,500. *Id.* ¶ 17. Also, Richard Markle, Mr. Cahill's attorney, wired $78,500 into a NAFCO account maintained by Mr.

---

[3] Because the Consents require the Court to treat the allegations set forth in the Complaint as true, Mr. Cahill's effort to demonstrate that the rising price of TRAE stock had more to do with exaggerated press announcements from TRAE's president than these phone calls is unavailing.

[4] Per the Consents, the Court may consider the Declaration of Robert Lowry, an expert and consultant hired by the SEC. *See* Cahill's Consent ¶ 3 ("the court may determine the issues . . . on the basis of . . . affidavits [and] declarations"); Whittemore Defs.' Consent ¶ 3 (same).

[5] Godwin Gruber LLP later became known as Godwin Pappas Langley Ronquillo LLP and then Godwin Ronquillo PC. The law firm is not implicated in any of the securities violations at issue.

[6] Mr. Cahill had recommended Mr. Offill, a former SEC lawyer, to Mr. Whittemore, who retained Mr. Offill. Mr. Offill was not charged in this case but has been convicted recently of a similar scheme of securities fraud; he is incarcerated awaiting sentencing.

Whittemore's wife, Tracy Whittemore, and her company TDW Management, Inc. ("TDW"). *Id.* ¶ 18.

The Whittemore Defendants broadcast a similar series of fraudulent messages intended to deceive recipients by making them believe they had received a hot stock tip about Yap International, Inc. ("YPIL"), an Internet communications company. *Id*. ¶¶ 10 & 15. Like the TRAE stock, YPIL's common stock is quoted in the Pink Sheets. On August 13, 2004, an unknown person or entity paid WMI 210,000 shares of YPIL to broadcast these messages. *Id*. ¶ 15.

The Whittemore Defendants broadcast messages regarding YPIL stock similar to those concerning the TRAE stock on August 30 and 31 and September 9, 2004, and other dates unknown. *Id*. ¶ 16. The following voicemail message, or a substantially similar message, was left on answering machines nationwide:

> Hey Mark, it's Jill. Listen, honey, Gary wanted me to give you a call. Um, I just put him on a plane and he didn't have time, but he wanted you to know . . . remember those guys that do those stock promotions? They're getting ready to start another one this week. And, they just did, let me look here, AUML and the other one was CNDD. Uh, he said that the next one you can get in on was Y-P as in Paul-I-L, I think. Yeah, YPIL. It's a communications company that's doing some sort of free long distance service called the Yapper. Anyway, he said he thought that it's gonna be the best one, uh the best stock promo this year. It's at 68 cents right now and they think it's going to go up to like six or seven dollars, or something outrageous. But anyway, he said you needed to get in on it in the morning before the price starts going up 'cause you definitely want to get in on this one. So, um, give him a call later tonight, and, um, I'll be talking to you soon. Bye sweetie.

*Id*.

Like the TRAE messages, the YPIL messages were effective. The YPIL share price rose from $.68 per share on August 27, 2004 to $1.00 per share on September 1, 2004. *Id*. ¶ 17. The

trading volume during this period rose from 7,380 to 302,814, an increase in market capitalization of approximately $10 million. *Id*.

The Whittemore Defendants profited from the YPIL stock scheme. Between August 16 and 31, 2004, Mr Whittemore sold 45,014 shares of YPIL generating proceeds totaling $35,902. Lowry Decl. ¶ 12. Further, Turbo Consulting Services, Inc., sold in excess of 100,000 YPIL shares between August and October 2004, generating proceeds of around $97,284. *See id*. ¶ 15. During September 2004, Turbo wired funds totaling $64,900 into the WMI IOLTA account. *Id.* ¶ 16. In addition, Turbo sent one wire in the amount of $8,130 directly to Mr. Whittemore's NAFCO Federal Credit Union account on August 18, 2004. *Id*. The wires from Turbo to the Whittemore Defendants totaled $73,030. *Id*.

The SEC seeks disgorgement of $738,473, the ill-gotten proceeds of the of TRAE securities transactions, jointly and severally from Mr. Cahill and the Whittemore Defendants. With regard to the YPIL fraud, the SEC seeks disgorgement from the Whittemore Defendants only (and not from Mr. Cahill) in the additional amount of $108,932, which includes:

$35,902 – proceeds of YPIL transactions made by the Whittemore Defendants

+ $73,030 – proceeds of Turbo's YPIL transactions wired to the IOLTA account

**Total** $108,932.[7]

---

[7] The SEC has amended the proposed order of judgment in this case numerous times in order to correct errors such as double-counting of disgorgement amounts and incorrect interest calculations. *See, e.g.*, Notice of Proposed Order [Dkt. # 83]; Notice of Proposed Order [Dkt. # 88]; Notice of Proposed Order [Dkt. # 92] (amendment of proposed order was necessary due to erroneous double-counting monies to be disgorged jointly and severally; SEC's Opp'n to Prejudgment Interest Calculations [Dkt. # 101] (amendment of proposed order to exclude double-counting of amount to be disgorged by the Whittemore Defendants and accounting for prejudgment interest through March 17, 2010, the date of the Amended Order [Dkt. # 93] which granted judgment in this case).

The SEC also seeks prejudgment interest and civil penalties against the Defendants.

Defendants object to the amounts of prejudgment interest awarded to the SEC by the Amended Order [Dkt. # 93]. Mr. Cahill claims that he held the ill-gotten proceeds from the illegal "pump and dump" scheme for a very short period of time. Mr. Cahill paid the TRAE stock monies almost immediately into the IOLTA account in the name of WMI at the firm of counsel for the Whittemore Defendants, "such that Mr. Cahill . . . at most enjoyed an 'interest-free loan' from the time he sold TRAE stock until the time he indisputably surrendered the proceeds." Cahill's Mot. for Recons. [Dkt. # 95] at 2. He contends that "the pretense of an 'interest-free loan' ends when the particular defendant clearly has no further use or enjoyment of the relevant funds." Cahill's Reply at 3-4. Instead of the $298,004 that the SEC calculates is due, jointly and severally, from all Defendants, Mr. Cahill argues that his prejudgment interest obligation should be limited to no more than $3,694.65. Cahill's Reply [Dkt. # 97] at 5. The Whittemore Defendants argue that their prejudgment interest obligation should be no more than $137,566.05 — interest on amounts they actually received from the IOLTA account.[8] As detailed here, the motions to reconsider will be denied and the Amended Order [Dkt. # 93] granting judgment will be corrected.

## II. LEGAL STANDARDS

Defendants seek reconsideration to correct a clerical error under Federal Rule of Civil Procedure 60(a), to rectify error under Rule 59(e), and to correct mistake, misrepresentation, or otherwise avoid injustice under Rule 60(b)(1), (3), and (6). A motion for reconsideration under

---

[8] The parties do not dispute that the Internal Revenue Service underpayment rate is the proper rate for prejudgment interest in disgorgement cases such as this one. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996). "That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *Id*.

Federal Rule of Civil Procedure 59(e) "is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Fox v. Am. Airlines Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). A Rule 59(e) motion is not "simply an opportunity to reargue facts and theories upon which a court has already ruled." *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995). Nor is it an avenue for a "losing party . . . to raise new issues that could have been raised previously." *Kattan v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993); *see also Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 183-84 (D.D.C. 2007).

Federal Rule of Civil Procedure 60(b) provides for motions for relief from a judgment or order due to: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (3) fraud, misrepresentation, or other misconduct; . . . or (6) "any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b). Rule 60(b)(6), the catch-all provision, gives courts discretion to vacate or modify judgments when it is "appropriate to accomplish justice," *Klapprott v. U.S.*, 335 U.S. 601, 614-15 (1949), but it should be applied only in extraordinary circumstances. *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. Mar. 6, 2007) (citing *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).

### III. ANALYSIS

While the SEC concedes that the Amended Order [Dkt.# 93] imposing judgment should be corrected to avoid double-counting of disgorgement amounts and to properly calculate prejudgment interest, Defendants have not demonstrated that the judgment should be otherwise amended. They have not presented an intervening change of controlling law or new evidence, they

have not demonstrated the need to correct a clear error or prevent manifest injustice, and they have not shown mistake, fraud, or any other reason justifying relief. While the Defendants in this case repeatedly attempt to avoid prejudgment interest, their Consents provide expressly that "[Defendants] agree that the Court *shall order* disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 231(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]." *See* Cahill's Consent ¶ 3 (emphasis added); Whittemore Defs.' Consent ¶ 3 (same).

Further, just as a defendant may be required to disgorge funds no longer in his possession, he may be required to pay prejudgment interest on such funds. Disgorgement of a defendant's ill-gotten gains from a securities fraud is an equitable remedy imposed to prevent unjust enrichment. *Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997). "The paramount purpose of . . . ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing." *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987). While the proper measure of disgorgement is the value by which a stock increased during the fraudulent activity,[9] *see SEC v. Bilzerian*, 814 F. Supp. 116, 121 (D.D.C. 1993), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994), the disgorgement amount only needs to be a "reasonable approximation of profits causally connected to the violation." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Further, "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. at 1232. In other words, the SEC only needs to offer a *prima*

---

[9] Defendants insist the correct term is "alleged fraudulent activity" because they explicitly did not admit or deny their participation in any fraud. *See* Cahill's Consent ¶ 2; Whittemore Defs.' Consent ¶ 2. For purposes of the disgorgement motion, however, the Court is required to accept the Complaint allegations as true, and the Complaint clearly charges each Defendant with securities fraud. Further, pursuant to their Consents, Defendants are precluded from arguing that they did not violate federal securities laws. *See* Cahill's Consent ¶ 3; Whittemore Defs.' Consent ¶ 3.

*facie* reasonable approximation of profits connected to the securities violation, and then the burden of proof shifts to the defendants to rebut the presumption that all profits gained while the defendants were in violation of the law constituted ill-gotten gains. *Bilzerian*, 814 F. Supp. 2d at 121.

A disgorgement obligation is "an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000). A defendant who spends all the proceeds of his fraudulent scheme is not immune from an order of disgorgement. *Id.* "[A]n order to disgorge establishes a personal liability, which the defendant must satisfy regardless whether he retains the selfsame proceeds of his wrongdoing." *Id.* (citing *SEC v Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974). In the March 9, 2010 Memorandum Opinion, the Court further explained:

> Mr. Cahill also argues that he retained none of the proceeds from the sale of TRAE shares and that the SEC should not be allowed to require him to disgorge monies he does not have in his possession. While this argument has facial appeal, the Court finds that it is not germane. The "manner in which [defendants] chose to spend [their] misappropriations is irrelevant as to [their] obligation to disgorge." *SEC v. Levine*, 517 F. Supp. 2d 121, 139 (D.D.C. 2007). "[W]hether they chose to use this money to enhance [their] social standing through charitable contributions, to travel around the world, or to keep [their] coconspirators happy is their own business." *Id.* Whether Mr. Cahill used the proceeds to pay Mr. Whittemore, Mr. Offill, or the grocer is irrelevant. He was a central part of a fraud that falsely and temporarily increased the stock value of TRAE and he sold hundreds of thousands of TRAE shares at inflated prices. He cannot now evade the consequences of these conceded actions.

Mem. Op. [Dkt. #90] at 12-13 (footnote omitted).

To prevent a wrongdoer from benefitting from an interest-free loan on his ill-gotten gains, courts require the payment of prejudgment interest. *Levine*, 517 F. Supp. 2d at 141. An award of prejudgment interest lies within the broad discretion of the district court. *SEC v. Kenton Capital,*

*Ltd.*, 69 F. Supp. 2d 1, 16 (D.D.C. 1998); *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1089 (D.N.J. 1996). To determine whether to award prejudgment interest, a court should consider (1) the need to fully compensate a wronged party; (2) fairness and the equities of the award; (3) the remedial purpose of the statute; (4) any other principles deemed relevant by the court. *Kenton Capital,* 69 F. Supp. 2d at 16 (citing *SEC v First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)). In *Hughes Capital*, the court found that an award of prejudgment interest comported with the fundamental notion of fairness — the victims of a "pump and dump" scheme were deprived of their funds, while the defendants had the benefit of the fraudulently obtained funds, for the years between the fraud and the judgment. *Hughes Capital*, 917 F. Supp. at 1090.

Similarly, the court in *Kenton* made an award of prejudgment interest. There, the defendants argued that they should not be required to pay prejudgment interest on the disgorged amount because they did not have continuous use of the funds. They had returned most of the money to investors, they had paid finders fees, and they had paid expenses. The court rejected this argument, awarding prejudgment interest because the defendants still benefitted from the use of the funds. The court explained that the defendants benefitted because they paid the funds to their various agents for the purpose of furthering the fraudulent scheme. *Kenton Capital*, 69 F. Supp. 2d at 16; *see SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1114-15 (9th Cir. 2006) (disgorgement amount should not be offset by payment of personal or business expenses).

Defendants argue that courts have declined to impose interest where a defendant did not actually have use or enjoyment of tainted funds, citing *SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) ("the balance of equities" favored denial of prejudgment interest because non-trading tipper "neither profited directly from trading nor did he have access to ill-gotten profits during the extended

proceedings in this case"); *SEC v. Zafar*, No. 06-CV-1578, 2009 WL 129492, *7 (E.D.N.Y. Jan. 20, 2009) (prejudgment interest limited to period before defendant was deprived of full use of the tainted funds by entry of an injunction and asset freeze, because prejudgment interest is awarded only for the period in which he "had use of unlawful profits"); *SEC v. Rubin*, No. 91-CIV-6531, 1993 WL 405428, *6 (S.D.N.Y. Oct. 8, 1993) (as to non-trading tipper, "interest would be a penalty because there is no evidence he shared in these profits and commissions or otherwise received value for them"). These cases are readily distinguishable. *Sargent* and *Rubin* both involve *non-trading* stock tippers who never received any ill-gotten gain at all — they did not trade stock based on the inside information they illegally passed on to others. *Zafar* involved a unique situation where a court order froze Mr. Zafar's assets, thereby completely depriving him of any use or benefit of the funds. Unlike the non-trading tippers, Defendants here clearly profited from the "pump and dump" scheme. And unlike the *Zafar* case, Defendants' assets have not been subject to any court-ordered freeze.

Soon after obtaining $738,473 from the sale of TRAE shares, Mr. Cahill paid $142,000 to the Whittemore Defendants for their auto-dialing services. Also, Mr. Cahill wired $549,300 to an IOLTA account in the name of WMI at Godwin Gruber LLP. Mr. Cahill contends that because he transferred most of the TRAE proceeds, he no longer had the use and enjoyment of the funds and he should not have to pay prejudgment interest on such funds. This claim flies in the face of equity. Mr. Cahill paid the monies to the Whittemore Defendants and to an IOLTA account in their name in compensation for their participation in the fraudulent "pump and dump" scheme. When a payment is made for the purpose furthering a fraudulent scheme, a defendant can be said to still have the benefit of the funds, *see Kenton Capital*, 69 F. Supp. 2d at 16, and he can be required to pay prejudgment interest on such amounts.

The Whittemore Defendants contend that they only received $300,000 from the IOLTA account plus $78,500 that was paid to TDW Management and that they should only have to pay prejudgment interest on these amounts. The Whittemore Defendants essentially seek reconsideration of the disgorgement amounts previously ordered by the Court, arguing that they should only have to pay prejudgment interest on amounts that the SEC can prove they actually received.

The Whittemore Defendants ignore the fact that this Court already held that they are jointly and severally liable for the TRAE profits in the amount of $738,473 and that they are liable for the YPIL profits totaling $108,932. They do not point to new evidence or any error requiring reconsideration of such amounts. Moreover, the SEC was not required to demonstrate that the Whittemore Defendants actually had possession of the profits of the fraud. The disgorgement amount only needs to be a "reasonable approximation of profits causally connected to the violation" and "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City Fin. Corp.*, 890 F.2d at 1231-32. The disgorgement ordered in this case meets this standard.

The Whittemore Defendants seem to argue also that they do not owe prejudgment interest on the disgorgement of profits from the YPIL sales that they received from Turbo. Turbo sold in excess of 100,000 YPIL shares, generating proceeds of around $97,284, and Turbo wired funds totaling $64,900 into the IOLTA account held in the name of WMI. Mem. Op. [Dkt. #90] at 7. Also, Turbo wired $8,130 directly to Mr. Whittemore's NAFCO Federal Credit Union account. The wires from Turbo to the Whittemore Defendants totaled $73,030. The Whittemore Defendants are required to disgorge these funds and to pay prejudgment interest on the full amount of

disgorgement.

Further, because the Whittemore Defendants are jointly and severally liable with Mr. Cahill with respect to the disgorgement amount related to the TRAE shares, they are jointly and severally liable for prejudgment interest on the TRAE disgorgement amount. The Defendants were all knowing participants in the TRAE stock "pump and dump" scheme. This Court previously explained:

> Defendants also argue that disgorgement should not be joint and several, but that each should be separately responsible for ill-gotten gain traced to them. Joint and several liability for disgorgement of ill-gotten gains is appropriate when two or more individuals collaborate or have a close relationship in engaging in the violations of securities law. *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1117 (9th Cir. 2006). In this case, it is clear that Defendants collaborated in the "pump and dump" scheme with regard to the TRAE stock. Mr. Cahill hired the Whittemore Defendants to broadcast fraudulent voicemail messages promoting the TRAE stock. Mr. Guidry paid Mr. Cahill 1.2 million shares of TRAE to raise capital for the company, and Mr. Cahill, in turn, paid the Whittemore Defendants 594,000 shares of TRAE for such auto-dialing services. The Whittemore Defendants later returned the stock to Mr. Cahill, and Mr. Cahill paid them $142,000. Because the Defendants collaborated, they should be jointly and severally liable for disgorgement related to the TRAE stock scheme.

Mem. Op. [Dkt. # 90] at 13; *see also Hughes Capital*, 917 F. Supp. at 1089-90 (defendants can be held jointly and severally liable for disgorgement and prejudgment interest when they were all knowing participants in the fraud).

## IV. CONCLUSION

As explained above, the following motions for reconsideration will be denied: The Whittemore Defendants' Motion for Reconsideration [Dkt. # 94]; Mr. Cahill's Motion for Reconsideration [Dkt. # 95]; and the Whittemore Defendants' Motion for Joinder in Cahill's Motion

for Partial Reconsideration [Dkt. # 98]. Because the SEC has conceded that certain corrections should be made, a Second Amended Order, replacing the Amended Order [Dkt. # 93], will be entered to correct erroneous accounting of prejudgment interest and to correct improper double-counting.[10] A memorializing Order accompanies this Memorandum Opinion.


Date: July 27, 2010                                         /s/
                                                ROSEMARY M. COLLYER
                                                United States District Judge

---

[10] See footnote 7 above.